[Cite as *Pool v. Ohio Dept. of Rehab. & Corr.*, 2017-Ohio-823.]

| | |
|---|---|
| JARVIS POOL | Case No. 2015-00587 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff was at all times relevant an inmate in the custody and control of defendant at the Grafton Correctional Institution (GCI). Plaintiff's amended complaint sets forth several causes of action arising out of an incident in which an employee of defendant at GCI, Corrections Officer Ashley Burger, allegedly used excessive force upon plaintiff on June 30, 2014. As set forth in the court's entry of November 25, 2015, plaintiff's claims for civil rights violations and injunctive relief were dismissed without prejudice, his claims for intentional and negligent infliction of emotional distress were dismissed, and his claims of assault, battery, and negligence remained for trial. The case proceeded to trial on those remaining claims before the undersigned magistrate.

{¶2} At trial, plaintiff testified that following a routine count of inmates on the afternoon of June 30, 2014, his cellmate, an older man named Davis, left their two-man cell for a period of time to undergo a diabetic check-up. Plaintiff stated that once Davis left, he sat down to use the toilet located inside the cell. As plaintiff recalled, Corrections Officer Burger was making security rounds through the housing unit when she stopped at the cell and ordered him to open the door. Plaintiff stated that he had only been transferred to GCI four days earlier and had never seen Burger before. Plaintiff stated that he refused to comply with Burger's directive, telling her instead that he was using the toilet. According to plaintiff, there was a window through which Burger

could have looked and had a partial view of him sitting on the toilet. Plaintiff testified that Burger repeated her order several times without giving him any reason why, but he remained on the toilet and would not open the door. Plaintiff related that Burger then unlocked the door, entered the cell, and asked him what he was smoking. According to plaintiff, he told Burger that he was not smoking anything but that he was burning an oil lamp. Plaintiff testified that he owned several different oils and cannot recall which one it was that he was burning.

{¶3} It was plaintiff's testimony that Burger then stood in front of him for two or three minutes, watching him and not saying a word as he sat on the toilet. Plaintiff stated that his underwear and shorts were pulled down below his knees and that he was wearing a shirt and shower shoes. Plaintiff recounted that he eventually flushed the toilet at some point while remaining seated, even though he was not done using the toilet. According to plaintiff, as soon as he flushed the toilet Burger charged at him while he was still seated and pushed his left shoulder into the sink, but he remained on the toilet seat. Plaintiff stated that Burger proceeded to pull him by the shoulder and repeatedly kick him in the shins to try to get him off the toilet. Although plaintiff testified that he was not belligerent and never put up any sort of resistance to Burger's efforts, it was also his testimony that he remained on the toilet seat for one to two minutes while Burger was trying to forcibly remove him. Plaintiff testified that Burger ultimately pulled him off the toilet and pushed him across the room and placed him against the wall. Plaintiff stated that he pulled his pants up with one hand as Burger was pulling him off the toilet, and that he had tissue paper in the other hand. According to plaintiff, Burger had not given him any directive beforehand to get against the wall.

{¶4} Plaintiff testified that Burger frisked him while he was against the wall and then she directed him to exit the cell. Plaintiff related that Burger followed him out and placed him in handcuffs outside the cell, and Burger then proceeded to "lock down" the unit, i.e. ordering the other inmates to get inside their cells. Plaintiff stated that Burger

had activated her "man down" alarm somewhere in the course of events, and by the time he was being handcuffed there were other officers responding to the scene. Plaintiff related that after Burger handcuffed him, Corrections Officer Ryan Tepus grabbed the cuffs and directed him to sit down on a bench, and thereafter Tepus went in and searched the cell.

{¶5} According to plaintiff, the handcuffs were too tight, causing his wrists to swell and bleed, and he complained to a Corrections Officer Costello and a Corrections Officer Murphy that his wrists hurt. After wearing the handcuffs for about 10 to 15 minutes, plaintiff stated, he was escorted to the infirmary and seen by a nurse. Plaintiff recalled telling the nurse that his wrists and his left shoulder hurt, but that he did not receive any medical treatment. Plaintiff stated that he was then escorted to the Special Management Unit (SMU).

{¶6} Regarding the search of the cell by Tepus, plaintiff testified that a hollow deodorant container identified by Tepus as containing a green leafy substance or residue did not belong to him. Plaintiff, who admitted that his prison term arises from three separate drug trafficking offenses and that he also had a prior felony drug trafficking offense, testified that he was not smoking or otherwise in possession of marijuana at the time of this incident. Nevertheless, plaintiff testified that prison authorities gave him a drug screening afterward, with the result being that he was cited with a rules infraction for his urine testing positive for marijuana.

{¶7} Later that day while he was still in the SMU, plaintiff stated, another staff member who had no involvement in the earlier events gave him a form known as an Inmate Use of Force Statement in which he was supposed to provide a written account of what happened. (Defendant's Exhibit A.) Plaintiff testified that the version of events he provided in this form was not entirely accurate, such as stating that he got up from the toilet, pulled his pants up, and opened the door in compliance with Burger's directive, and that the only force used by Burger was pushing him against the wall.

According to plaintiff, he actually remained on the toilet with his pants down when Burger opened the door, she saw him partially nude, and she used significantly more force against him than he indicated in this form. Plaintiff's explanation for not initially providing the version of events that he testified to at trial was that he was afraid of being charged with some sort of rules infraction for sexual misconduct based upon his being partially nude in front of a woman, and he was also afraid of being retaliated against for being in a physical altercation with a woman.

{¶8} Similarly, plaintiff testified that he later prepared two Informal Complaint Resolution (ICR) forms to lodge his dissatisfaction with what had occurred, explaining that he wrote one first and then wrote another version after he received Conduct Reports prepared by Burger and Tepus, charging him with institutional rules infractions. (Defendant's Exhibits B & C.) Plaintiff stated that the ICRs also contain inaccuracies akin to what he wrote in the Inmate Use of Force Statement, and again plaintiff explained that he did so for fear of being retaliated against or being accused of sexual misconduct.

{¶9} Plaintiff testified that defendant transferred him to the Southern Ohio Correctional Facility (SOCF) the following day, July 1, 2014. Plaintiff stated that he was continuing to experience pain in his left shoulder and back as a result of the incident, and that he reported his injuries to a nurse who examined him once he arrived at SOCF, but that he did not receive any treatment. Plaintiff testified that on July 6, 2014, he submitted a Health Services Request form seeking medical attention for an insect bite, but even though he was still in pain from injuries sustained during the incident in question, plaintiff stated, he did not mention any such injuries or seek treatment associated with such injuries at that time. (Defendant's Exhibit E.) According to plaintiff, he declined to do so because he still feared being retaliated against, despite being at a different institution.

{¶10} Plaintiff testified that on July 14, 2014, however, he did submit a Health Services Request form to seek medical attention for shoulder and back ailments that he attributed to Burger's use of force. (Plaintiff's Exhibit 12.) According to plaintiff, he had changed his thinking by that time and could not let the matter go on any longer without speaking up for himself. Plaintiff stated that he consequently underwent a medical examination two days later, on July 16, 2014, and that he reported his medical complaints again at that time as documented in a nursing assessment form. (Plaintiff's Exhibit 13.)

{¶11} Plaintiff stated that he did seek out some further attention for his medical concerns and saw a doctor at some point, but the doctor did not feel that there was anything wrong with him. Plaintiff also stated that he requested diagnostic x-rays or a CAT scan but that defendant's medical professionals declined to provide them. Regardless, plaintiff testified that he still feels pain in his left shoulder and in his back from time to time, especially when he sits or lays in certain positions for a long time, and he estimated the level of pain to be 5 or 6 on a scale of 1 to 10. According to plaintiff, his injuries have limited some of the things he can do while exercising, including not being able to perform as many push-ups and pull-ups. Beyond his physical symptoms, plaintiff stated, he was embarrassed and humiliated by what happened and he continues to have difficulty coping with the embarrassment of Burger seeing him partially nude, so severely in fact that he has nightmares, he feels down sometimes, and he has low self-esteem around women.

{¶12} Ashley Burger testified that at the time of the incident she was employed with defendant as a corrections officer at GCI. Burger explained that she later chose to move into an administrative professional position at GCI with more favorable working hours. Burger related that on the day in question, she was in the process of making one of her required, periodic security rounds through the B-5 housing unit when she detected the odor of marijuana in the vicinity of plaintiff's cell. Burger stated that she

was experienced in the detection of marijuana in the course of her work as a corrections officer. According to Burger, she initially entered another cell that was next to plaintiff's, but upon inspecting that cell and not detecting marijuana there, she approached plaintiff's cell, where she noticed the odor to be very strong.

{¶13} Burger testified that she pulled on plaintiff's door but it was locked. Plaintiff then came to the window, Burger stated, and she asked him to open the door but he gave no response. Burger denied that plaintiff ever told her he was using the toilet, which she estimated to be a foot or so from the door, and she added that an inmate needing privacy can put a card in the window indicating as much but plaintiff had not done so. Burger related that she gave plaintiff at least three directives to open the door, but he did not comply. According to Burger, she consequently radioed for assistance and used a key to unlock the door. Burger stated that when she opened the door, plaintiff was fully clothed and standing in front of the toilet, which he was flushing. Burger testified that she looked in the toilet bowl and, rather than any bodily substances, she saw green balloons. From Burger's account, she went toward the toilet to try to seize the balloons before they were flushed, but plaintiff used his elbows and body to push her away by her arms and chest to block her from the toilet. Burger stated that when plaintiff pushed her she feared for her own safety and activated her man down alarm to summon other officers to the scene. Burger recounted that the balloons were not washed away with the first flush, so plaintiff continued pushing her away and flushing the toilet until all the balloons were gone.

{¶14} Burger testified that she was ordering plaintiff to get out of the cell as he flushed the balloons down the toilet, but not until they were all gone did plaintiff comply, walking out of the cell without any resistance as she guided him out and had him stand against a wall in the common area of the unit, approximately ten feet from the cell. According to Burger, she used minimal force in escorting plaintiff out of the cell, given that plaintiff had become compliant by that point. Regarding the incident as a whole,

contrary to plaintiff's version of events Burger testified that she never charged into plaintiff, kicked him, grabbed him, or otherwise used force the way that he claims, and she stated that she never saw him collide with the sink. Burger also stated that she did not have any visible injuries herself.

{¶15} Once plaintiff was against the wall, Burger stated, she began locking down the unit, giving directives to the other inmates to return to their cells, and at that time other officers arrived at the scene, including Corrections Officer Tepus. Burger testified that Tepus placed handcuffs on plaintiff and that she remained in the area for about ten minutes afterward, during which time she did not hear plaintiff voice any complaint about the handcuffs being too tight. Burger also testified that one or more of the responding officers carried out a search of plaintiff's cell, but that she was not involved. Burger stated that she subsequently prepared an Incident Report to document what occurred, and that she also prepared a Conduct Report to charge plaintiff with violating defendant's institutional Rules 4 ("Causing, or attempting to cause, physical harm to another"), 20 ("Physical resistance to a direct order"), and 21 ("Disobedience of a direct order"). (Plaintiff's Exhibits 1 & 2.)

{¶16} Corrections Officer Ryan Tepus testified that he is employed with defendant at GCI and that at the time of the incident he was serving as a "yard officer." In that capacity, Tepus explained, he would monitor the prison yard and perimeters, and also respond to medical emergencies and man down alarms, also known as a "Signal 3," which are activated when an officer needs immediate assistance.

{¶17} Tepus testified that on the date in question he responded to a Signal 3 alerting him to Burger's location, and when he arrived there he saw that Burger had plaintiff standing against the wall. Other personnel who responded included another corrections officer, a sergeant, and the shift lieutenant, Tepus recalled. Tepus stated that he applied handcuffs to plaintiff by himself, as Burger stood nearby. According to Tepus, plaintiff was compliant while the handcuffs were being applied. Tepus stated

that he double-locked the handcuffs to prevent them from over-tightening, and that he never heard plaintiff complain that they were too tight or ask to have them loosened, nor did he observe any injury from the handcuffs or hear plaintiff complain of any kind of injury, to his wrists or otherwise. Tepus related that he had plaintiff sit down on a chair after the handcuffs were applied.

{¶18} According to Tepus, he then conducted a "shakedown," or search, of plaintiff's cell. While doing so, Tepus stated, he found a deodorant container inside a trash receptacle, and when he opened it up he observed that it was hollow and contained no deodorant, but there was a green leafy substance or residue inside. Tepus testified that he tagged the deodorant container as contraband and sent it to the shift office. Tepus identified the deodorant container in a set of copies of photographs, although he stated that he did not take the photographs and that the green leafy substance or residue cannot be discerned in these low quality, black-and-white copies. (Plaintiff's Exhibit 14.)

{¶19} Tepus stated that he prepared both an Incident Report to document his involvement in the matter, as well as a Conduct Report charging plaintiff with violating institutional Rule 51 ("Possession of contraband, including any article knowingly possessed which has been altered or for which permission has not been given"). (Plaintiff's Exhibts 3 & 4.) Tepus stated in the Conduct Report that the deodorant container smelled like marijuana. Tepus testified that he could not remember whether plaintiff had a cellmate, but that he only prepared one Conduct Report. Tepus related that he did not have any further responsibilities concerning the contraband that he found, such as having it tested, and he does not know what went on with it afterward.

{¶20} Nurse Janis Reiter testified that she is employed with defendant at SOCF. As Reiter explained, inmates are given a medical evaluation every time defendant transfers them from one institution to another, and she performs these evaluations as part of her job duties. Reiter authenticated a copy of a Medical Exam Report that she

prepared when performing such an evaluation on plaintiff upon his arrival at SOCF on July 1, 2014, following his transfer from GCI. (Plaintiff's Exhibit 10.)

{¶21} Reiter stated that she has no independent recollection of the evaluation, but she testified about what she documented in the Medical Exam Report. Reiter explained that in the "subjective evaluation" portion of the document, she records any complaints that are raised by the inmate, but in this case no complaints were noted and instead she quoted plaintiff as telling her the following: "THEY SAID I ASSAULTED SOMEONE, I HAVE NO INJURIES". Reiter also explained that in a separate portion of the document she records her objective findings upon examining the inmate, and in this case she noted several normal findings and that plaintiff appeared to be healthy, with the exception that she noted the presence of abrasions on both of plaintiff's wrists. According to the assessment portion of the form, Reiter attributed the abrasions to the application of wrist restraints, but she found that no treatment was needed.

{¶22} Nurse Teresa Hill testified that she is employed with defendant at SOCF and that she performed a musculoskeletal system assessment of plaintiff on July 16, 2014. Hill authenticated a copy of the assessment form that she prepared during the appointment. (Plaintiff's Exhibit 13.) As Hill testified, in the portion of the form for subjective complaints she noted that plaintiff complained to her that he believed his right shoulder was dislocated and that he also felt his spine or back was injured. Hill explained that she tested plaintiff's shoulder function, and whereas it would be painful for a patient with a dislocated shoulder to remove his shirt, she documented that plaintiff did not have pain when removing his shirt. According to Hill, while plaintiff may have been experiencing pain in his shoulder, her assessment was that it was not attributable to a shoulder dislocation. Insofar as Hill noted in her assessment form that there was a "lump" in plaintiff's right shoulder joint, she testified that she cannot remember any more detail about that, such as whether it may have been part of plaintiff's bone structure. As

Hill related, upon concluding her assessment she gave plaintiff some Motrin and referred him to see an advanced level provider for follow-up.

{¶23} "To prove assault under Ohio law, plaintiff must show that the defendant willfully threatened or attempted to harm or touch the plaintiff offensively in a manner that reasonably placed the plaintiff in fear of the contact. To prove battery, the plaintiff must prove that the intentional contact by the defendant was harmful or offensive. Ohio courts have held that, in a civil action for assault and battery, the defendant has the burden of proving a defense of justification, such as the exercise of lawful authority." (Citations omitted.) *Miller v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-12, 2012-Ohio-3382, ¶ 11; *see also Brown v. Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 13AP-804, 2014-Ohio-1810, ¶ 13 ("A defendant may defeat a battery claim by establishing a privilege or justification defense.").

{¶24} "To recover on a negligence claim, a plaintiff must prove by a preponderance of the evidence (1) that a defendant owed the plaintiff a duty, (2) that a defendant breached that duty, and (3) that the breach of the duty proximately caused a plaintiff's injury." *Ford v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 05AP-357, 2006-Ohio-2531, ¶ 10. "Ohio law imposes a duty of reasonable care upon the state to provide for its prisoners' health, care, and well-being." *Ensman v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 06AP-592, 2006-Ohio-6788, ¶ 5. "The inmate also bears a responsibility 'to use reasonable care to ensure his own safety.'" *Gumins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 10AP-941, 2011-Ohio-3314, ¶ 20, quoting *Macklin v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 01AP-293, 2002-Ohio-5069, ¶ 21.

{¶25} "The use of force is sometimes necessary to control inmates." *Jodrey v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-477, 2013-Ohio-289, ¶ 17. "Correctional officers considering the use of force must evaluate the need to use force based on the circumstances as known and perceived at the time it is considered."

*Brown* at ¶ 15, citing Ohio Adm.Code 5120-9-01(C). "[T]he precise degree of force required to respond to a given situation requires an exercise of discretion by the corrections officer." *Ensman* at ¶ 23. "In Ohio Adm.Code 5120-9-01, the Ohio Administrative Code sets forth the circumstances under which correctional officers are authorized to use force against an inmate." *Id.* at ¶ 6.

{¶26} Ohio Adm.Code 5120-9-01 provides, in pertinent part:

{¶27} "(C) Guidelines regarding the use of force. * * *

{¶28} "* * *

{¶29} "(2) Less-than-deadly force. There are six general circumstances in which a staff member may use force against an inmate or third person. A staff member may use less-than-deadly force against an inmate in the following circumstances:

{¶30} "(a) Self-defense from physical attack or threat of physical harm.

{¶31} "(b) Defense of another from physical attack or threat of physical attack.

{¶32} "(c) When necessary to control or subdue an inmate who refuses to obey prison rules, regulations or orders.

{¶33} "(d) When necessary to stop an inmate from destroying property or engaging in a riot or other disturbance.

{¶34} "(e) Prevention of an escape or apprehension of an escapee; or

{¶35} "(f) Controlling or subduing an inmate in order to stop or prevent self-inflicted harm."

{¶36} "Pursuant to Ohio Adm.Code 5120-9-01(C)(1)(a), correctional officers 'may use force only to the extent deemed necessary to control the situation.' Additionally, correctional officers 'should attempt to use only the amount of force reasonably necessary under the circumstances to control the situation and shall attempt to minimize physical injury.' Ohio Adm.Code 5120-9-01(C)(1)(b)." *Brown* at ¶ 16. Also pertinent is Ohio Adm.Code 5120-9-01(B)(3), which defines "excessive force" as "an application of force which, either by the type of force employed, or the extent to which

such force is employed, exceeds that force which reasonably appears to be necessary under all the circumstances surrounding the incident."

{¶37} Upon review of the evidence presented at trial, the magistrate finds as follows. While making security rounds on June 30, 2014, Corrections Officer Burger detected an odor of marijuana in the vicinity of plaintiff's cell. In an effort to enforce institutional rules prohibiting marijuana, Burger began to search for the source of the odor. After checking one of the cells next to plaintiff's and determining that it was not the source, Burger arrived at plaintiff's door and detected a very strong odor. Plaintiff had shut and locked the door after his cellmate left for a medical appointment. Burger gave plaintiff several directives to open up the door and plaintiff heard Burger do so, but he failed to comply. Burger then called for assistance over her radio, unlocked the door, and entered the cell. The contention by plaintiff that institutional policy did not permit Burger, as a woman, to enter the cell alone was not substantiated at trial.

{¶38} When Burger entered the cell, plaintiff was standing in front of the toilet, fully clothed, and attempting to flush the contents of the toilet bowl, comprised of green balloons rather than any bodily substances. Burger approached the toilet to seize the balloons as potential evidence of rules infractions, but plaintiff pushed her away by her upper body, at which point Burger activated her man down alarm to summon an emergency response from other officers. Burger ordered plaintiff out of the cell, but he failed to comply and instead continued flushing the toilet and blocking Burger from accessing the toilet until all the balloons had been flushed away.

{¶39} Plaintiff then walked out of the cell as Burger escorted him into the common area of the unit and directed him to stand against the wall. Around that time, Corrections Officer Tepus and other responders arrived at the scene, and while Burger locked down the unit, Tepus placed plaintiff in handcuffs. At the direction of Tepus, plaintiff sat down on a bench after the handcuffs had been applied. Tepus proceeded to search plaintiff's cell and found a hollow deodorant container with a green leafy

substance or residue inside, which had an odor of marijuana. Plaintiff was subsequently administered a drug screening and tested positive for marijuana.

{¶40} Although plaintiff claims that he reported shoulder and back injuries to a nurse at GCI on June 30, 2014, and to a nurse at SOCF on July 1, 2014, neither nurse documented such complaints and it is more probable than not that plaintiff actually did not report any such injuries at those times. Plaintiff also did not report any injuries in his Inmate Use of Force Statement or his ICRs. Two weeks after the incident, on July 14, 2014, plaintiff sought attention for back and shoulder problems, and consequently Nurse Hill examined him the next day; notably, Hill recorded that plaintiff complained about his right shoulder, whereas at trial plaintiff complained about his left shoulder. There is little or no credible evidence of any further treatment and it was not established that plaintiff was ever diagnosed with any back or shoulder injury.

{¶41} Under the circumstances in which plaintiff refused to obey orders from Burger including her order to get out of the cell, plaintiff appeared to be in the process of actively destroying property tying him to the violation of prison rules, and plaintiff pushed Burger and forcibly resisted her orders, Burger was justified and privileged to use force as may have reasonably appeared to be necessary. Burger's account of the physical encounter between her and plaintiff was more persuasive than plaintiff's account, establishing that Burger merely tried to get around plaintiff to access the toilet, but that plaintiff blocked her path and pushed her away. Contrary to plaintiff's testimony, Burger did not kick, grab, or charge plaintiff. Any force used by Burger was incidental to resisting and defending against plaintiff's pushing and blocking of her and involved struggling against plaintiff with her upper body and arms, and, in addition, she used some minimal force with her hands to escort plaintiff out of the cell. The degree of force used by Burger was not excessive and satisfied the duty of reasonable care.

{¶42} Plaintiff's version of the facts is rejected for several reasons. Plaintiff contends that he was merely using the toilet and minding his own business such that

Burger had no cause whatsoever to enter the cell.  However, plaintiff did not put a card in the window to indicate he was using the toilet, Burger credibly testified that she never heard plaintiff say he was using the toilet, and when Burger entered the cell plaintiff was fully clothed and attempting to flush balloons rather than bodily waste.  Plaintiff's assertion that he was not smoking or otherwise in possession of marijuana is belied by Burger's detection of a strong marijuana odor emanating from his cell, by the balloons that he determinedly flushed down the toilet, by the deodorant container with a green leafy substance or residue that was found discarded in his trash can, and by his testing positive for marijuana.  The description plaintiff gave at trial of Burger standing in the cell and gazing at him for two to three minutes while he sat on the toilet and relieved himself is beyond all reason.

{¶43} Plaintiff's version of what happened changed over time.  Even the Inmate Use of Force Statement and ICRs that he submitted early on were not entirely consistent with one another.  Plaintiff's explanation for the varied accounts is that he initially feared that telling the truth would result in some retaliation or other adverse consequences.  The plausibility of this explanation is strained by the fact that plaintiff claims there was no underlying wrongful act on his part to be retaliated against and by his testimony that he did complain about Burger supposedly injuring his back and shoulder to nurses both at GCI on June 30, 2014, and at SOCF on July 1, 2014.  Regardless of any variances in plaintiff's story, however, the testimony of Burger was simply more persuasive than that of plaintiff and was far more consistent with the rest of the evidence, especially the evidence of plaintiff's involvement with marijuana.

{¶44} Additionally, plaintiff's own actions in pushing Burger, physically resisting Burger's orders and blocking her from the toilet as he destroyed the balloons represented a failure on the part of plaintiff to exercise reasonable care for his own safety.  Although it was not demonstrated with credible evidence that plaintiff suffered

any injury during the incident with Burger, any injury he may have sustained was proximately caused by his own negligence.

{¶45} Accordingly, plaintiff failed to prove his claims of assault, battery, and negligence arising from the alleged excessive use of force by Burger.

{¶46} Finally, although the amended complaint does not raise the issue of harm resulting from being handcuffed after the incident, evidence was presented on that issue, but even if that issue was tried with the implied consent of the parties plaintiff failed to prove that he is entitled to relief. The testimony of Corrections Officer Tepus established that plaintiff gave no indication the handcuffs were too tight when Tepus applied them. Furthermore, Tepus and Burger never heard plaintiff complain about the handcuffs during the 10 to 15 minutes that he remained in the unit. While plaintiff contends that he did complain, his testimony overall lacked credibility. And, the nurse who examined plaintiff afterward found only some slight redness and indentation incidental to the handcuffs. Even if plaintiff was harmed to that extent, he did not present credible evidence that any of the employees knew or should have known of any unreasonable hazard posed by the handcuffs. Lastly, although the nurse who examined plaintiff after his transfer to SOCF the following day noted abrasions to the wrists, this was separate and distinct from the mere redness and indentation noted the day before, it occurred after plaintiff wore handcuffs while traveling the considerable distance from GCI to SOCF, and it was not shown to have been proximately caused by being handcuffed for 10 to 15 minutes after the incident at GCI.

{¶47} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claims by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶48} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files*

*objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

                                        _____

                                          ROBERT VAN SCHOYCK
                                          Magistrate

cc:

Byron L. Potts
538 East Rich Street
Columbus, Ohio 43215

Christopher L. Bagi
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed February 23, 2017**
**Sent to S.C. Reporter 3/7/17**